**No. 26-2113**

# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

ALEKSEI MOROZOV,

*Petitioner-Appellee*,

*v.*

WARDEN, LAWRENCE COUNTY JAIL

*Respondent*,

FIELD OFFICE DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
UNITED STATES ATTORNEY FOR THE DISTRICT OF SOUTH DAKOTA,

*Respondents-Appellants*.

On Appeal from the United States District Court
for the District of South Dakota, No. 5:26-cv-05030-RAL
Before the Honorable Roberto A. Lange, Chief District Judge

## PETITIONER-APPELLEE'S BRIEF


James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
(605) 341-4400

Rebecca Cassler
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L. Street NW, Suite 500
Washington, DC 20036
(202) 507-7514

Stephanie E. Norton
Gracie Willis
Yulie Landan
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
(202) 217-4742


September 8, 2026

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

In 2023, Petitioner Aleksei Morozov fled political persecution in Russia. After he properly presented himself at a port of entry, our government permitted him to come into the United States to seek asylum. Necessarily determining he posed no flight risk or danger, the Department of Homeland Security (DHS) released him on humanitarian parole, permitting him to live at liberty while pursuing asylum, and granted him work authorization until 2029. Morozov complied with all DHS asked of him, keeping the agency apprised of his address, staying out of trouble, and diligently petitioning for asylum, while becoming a respected member of his community. But last year, immigration officers re-arrested him with no justification or individualized review.

The district court correctly found that Morozov's arbitrary re-detention violated the Fifth Amendment's Due Process Clause. Now, despite never asserting any individualized reason for that detention, Respondents ask this Court not only to reverse the district court's judgment, but to entertain new arguments never raised below, radically reinterpret the Constitution contrary to Supreme Court precedent, and effectively eliminate the due process rights of thousands of noncitizens detained in this Circuit regardless of their individual circumstances. The Court should reject this invitation and affirm the decision below.

Oral argument is warranted and Petitioner requests 20 minutes.

## TABLE OF CONTENTS

SUMMARY AND REQUEST FOR ORAL ARGUMENT .................................... i

TABLE OF AUTHORITIES .................................... iv

STATEMENT OF THE ISSUE .................................... 1

STATEMENT OF THE CASE .................................... 1

I. Factual Background .................................... 1

II. Procedural History .................................... 3

III. Due Process and Immigration Detention .................................... 4

A. Early Protection Against Arbitrary Deprivation of Physical Liberty ......... 4

B. Modern Statutory Framework for Immigration Detention and Its Constitutional Limits .................................... 5

SUMMARY OF ARGUMENT .................................... 8

STANDARD OF REVIEW .................................... 11

ARGUMENT .................................... 12

I. Morozov Has a Constitutionally Protected Interest in His Liberty. ............. 13

A. Morozov Has an Enumerated Right to Physical Liberty, and Respondents Forfeited Any Argument Otherwise. .................................... 13

B. Morozov's Prior Release Created a Strong Interest in His Continued Liberty. .................................... 20

II. Respondents Can Only Deprive Morozov of His Liberty for a Special Justification, But Never Offered One Here. .................................... 25

A. The Supreme Court Requires a "Special Justification," Not a "Rational Basis," for Immigration Detention. .................................... 26

B. Immigration Detention is Permissible Only If It Prevents Flight Risk or Danger. .................................... 27

C. Morozov's Re-Detention Is Neither Individually nor Categorically Justified. .................................... 28

III. Respondents Can Only Deprive Morozov of His Liberty with Adequate Procedures, But Provided None Here. .................................... 37

A. *Doe* Does Not Preclude Morozov from Seeking Additional Process. ...... 38

B. The "Entry Fiction" Does Not Bar Morozov's Right to Adequate Process. ........................................................................................ 41

C. The District Court Appropriately Applied *Mathews* to Assess What Process Is Required. ....................................................... 48

D. Under Either *Mathews* or *Mullane*, Morozov Never Received Adequate Process. ........................................................................ 50

CONCLUSION ........................................................................................ 54

## TABLE OF AUTHORITIES

### Cases


*A.A.R.P. v. Trump*, 605 U.S. 91 (2025) .............................................. 18, 20, 43, 49
*Addington v. Texas*, 441 U.S. 418 (1979)................................................ 37, 48, 50
*Al Khouri v. Ashcroft*, 362 F.3d 461 (8th Cir. 2004)............................................ 42
*Alvarez-Garcia v Ashcroft*, 378 F.3d 1094 (9th Cir. 2004).................................. 43
*Banyee v. Garland*, 115 F.4th 928 (2024) .......................................... 30, 35, 48, 49
*Barbosa Da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026)............................... 8, 41
*Betancourth v. Tate*, 822 F. Supp. 3d 762 (S.D. Tex. 2026) ................................. 53
*Bliek v. Palmer*, 102 F.3d 1472 (8th Cir. 1997) .................................................... 50
*Buele Morocho v. Warden Phila. FDC*, No. 26-1150,
  2026 WL 2546223 (3d Cir. Aug. 28, 2026)....................................... 8, 28, 38, 52
*Carlson v. Landon*, 342 U.S. 524 (1952)........................................... 27, 33, 34, 35
*Chavero-Linares v. Smith*, 782 F.3d 1038 (8th Cir. 2015).................................... 15
*Cirrus Rojas v. Olson*, 183 F.4th 909 (7th Cir. 2026) .............................................. 8
*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)................................ 37
*Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003) ........ 10, 38, 39
*Demore v. Kim*, 538 U.S. 510 (2003) ........................................................... passim
*Dep't of State v. Muñoz*, 602 U.S. 899 (2024)....................................................... 15
*DHS v. Thuraissigiam*, 591 U.S. 103 (2020)................................................. passim
*Doe v. Jamison*, No. 26-cv-1906,
  2026 WL 916568 (E.D. Pa. Mar. 31, 2026)........................................................ 19
*Dusenbery v. United States*, 534 U.S. 161 (2002)................................................. 49
*Edwards v. Lockhart*, 908 F.2d 299 (8th Cir. 1990)........................................ 22, 23
*Ex parte Tsuie Shee*, 218 F. 256 (N.D. Cal. 1914) ................................................ 17
*Fils-Aime v. FCI Berlin, Warden*, 808 F. Supp. 3d 218 (D.N.H. 2025)................. 44
*Finch v. Payne*, 983 F.3d 973 (8th Cir. 2020) ........................................................ 11
*Foucha v. Louisiana*, 504 U.S. 71 (1992) ........................................... 26, 37, 40, 50
*Franco v. Moreland*, 805 F.2d 798 (8th Cir. 1986)............................................... 49
*Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583 (1926) ................................ 19
*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ................................................ 21, 22, 37
*Galvan v. Press*, 347 U.S. 522 (1954).................................................................... 20
*Goldberg v. Kelly*, 397 U.S. 254 (1970)................................................................ 53

*Gomez Vera v. De Anda-Ybarra*, No. 1:26-CV-01491
2026 WL 2031690 (D.N.M. July 14, 2026) .......................................................... 47
*Gonzalez Arias v. Woodbury Cnty. Jail*, No. C26-4041,
2026 WL 1735035 (N.D. Iowa June 16, 2026) ................................................ 25
*Griffin v. Wisconsin*, 483 U.S. 868 (1987) ............................................................. 24
*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .................................................. 14, 48, 51
*Harisaiades v. Shaughnessy*, 342 U.S. 580 (1952) .................................................. 6
*Heller v. Doe*, 509 U.S. 312 (1993) ................................................................... 26, 27
*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ....................................... 24, 52
*Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021) ..................................... 18, 34
*Herrera Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026) ................................ 7, 8, 35
*Hing Sum v. Holder*, 602 F.3d 1092 (9th. Cir. 2010) ................................................ 6
*Holmes v. Jennison*, 39 U.S. 540 (1840) ............................................................... 4, 5
*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) .............................. 25
*INS v. Stevic*, 467 U.S. 407 (1984) ........................................................................... 18
*Jackson v. Indiana*, 406 U.S. 715 (1972) ................................................................. 50
*Jenner v. Nikolas*, 828 F.3d 713 (8th Cir. 2016) ..................................................... 37
*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .................................................. passim
*Jones v. United States*, 463 U.S. 354 (1983) ........................................................... 16
*Kansas v. Hendricks*, 521 U.S. 346 (1997) .............................................................. 26
*Kaplan v. Tod*, 267 U.S. 228 (1925) ......................................................................... 46
*Kerry v. Din*, 576 U.S. 86 (2015) ......................................................................... 4, 13
*Khasanova v. Rokosky*, No. 26-cv-763, 2026 WL 1815723
(D. Ariz. June 24, 2026) ................................................................................... 44, 45
*Khutyaev v. Arnott*, 823 F. Supp. 3d 964 (W.D. Mo. 2026) .................................. 25
*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ...................... 19
*Kortiev v. Rodriguez*, No. SA-26-CA-00971,
2026 WL 754843 (W.D. Tex. Mar. 13, 2026) ...................................................... 47
*Kroupa ex rel. B.K. v. Nielsen*, 731 F.3d 813 (8th Cir. 2013) ................................ 51
*Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989) ...................................... 9, 12
*L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799 (8th Cir. 2012) ......... 19
*Landon v. Plasencia*, 459 U.S. 21 (1982) ........................................................... 45, 47
*Leng May Ma v. Barber*, 357 U.S. 185 (1958) ..................................................... 6, 27
*Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026) ........................... 8, 16, 31

*Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) .................................. 27
*Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987)............................................ 41
*Make the Road New York v. Mullin*, 179 F.4th 16 (D.C. Cir. 2026) ................ 49, 54
*Mathews v. Diaz*, 426 U.S. 67 (1976)............................................................ 20, 43
*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................ 1, 11, 50
*Matter of Pierre*, 14 I. & N. Dec. 467 (BIA 1973)............................................... 43
*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) ............................ 49
*Michael H. v. Gerald D.*, 491 U.S. 110 (1989) ..................................................... 39
*Mills v. Rogers*, 457 U.S. 291 (1982) .................................................................... 12
*Mirabelli v. Bonta*, 607 U.S. 492 (2026) ............................................................... 15
*Moore v. Warwick Pub. Sch. Dist. No. 29*, 794 F.2d 322 (8th Cir. 1986)............. 50
*Morrissey v. Brewer*, 408 U.S. 471 (1972).................................................... passim
*Morrissey v. Brewer*, 443 F.2d 942 (8th Cir. 1971) ....................................... 40, 41
*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)............ 49, 53
*Mullin v. Al Otro Lado*, 146 S.Ct. 2079 (2026)...................................................... 19
*Murray's Lessee v. Hoboken Land & Improvement Co.*,
59 U.S. 272 (1855) ............................................................................................... 4
*Muse v. Mullin*, No. 26-cv-4024, 2026 WL 1008532
(N.D. Iowa Apr. 14, 2026) ................................................................................ 22
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................................ 18
*Nishimura Ekiu v. United States*, 142 U.S. 651 (1982).................................. 17, 46
*Nyirenda v. INS*, 279 F.3d 620 (8th Cir. 2002) ..................................................... 42
*O'Connor v. Donaldson*, 422 U.S. 564 (1975)......................................... 25, 37, 52
*Perry v. Precythe*, 121 F.4th 711 (8th Cir. 2024) .................................................. 14
*Reno v. Flores*, 507 U.S. 292 (1993) .................................................. 15, 31, 36, 39
*Rincon v. Hyde*, 810 F. Supp. 3d 101 (D. Mass. 2025) ......................................... 47
*Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003) ..................................... 41
*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ........................................ 53
*Santillan Quiroz v. Mullin*, 180 F.4th 1226 (10th Cir. 2026)...................... 8, 20, 26
*Schall v. Martin*, 467 U.S. 253 (1984)........................................................... 48, 53
*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ........................ 46
*Sosnava Rodriguez v. Ortega*, 180 F.4th 702 (5th Cir. 2026),
*reh'g en banc granted, opinion vacated*, 181 F.4th 608 (5th Cir. 2026) ........ 8, 41
*Strunin v. Garcia*, 827 F. Supp. 3d 976 (S.D. Tex 2026)............................... 25, 47

*Torres v. Barr*, 976 F.3d 918 (9th Cir. 2020) .......................................................... 6
*Trump v. J.G.G.*, 604 U.S. 670 (2025) ...................................................... 42, 43, 49
*U.S. ex rel. Heikkinen v. Gordon*, 190 F.2d 16 (8th Cir. 1951),
*vacated as moot sub nom. Gordon v. Heikkinen*, 344 U.S. 870 (1952) ........ 17, 28
*Union Refrigerator Transit Co. v. Commonwealth of Ky.*, 199 U.S. 194 (1905)... 45
*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950)........................ 46
*United States v. Knights*, 534 U.S. 112 (2001)...................................................... 24
*United States v. Neal*, 679 F.3d 737 (8th Cir. 2012) ............................................. 14
*United States v. Ogilvi*e, 153 F.4th 1098 (10th Cir. 2025). .................................... 28
*United States v. Rahimi*, 602 U.S. 680 (2024)....................................................... 12
*United States v. Salerno*, 481 U.S. 739 (1987)............................................... passim
*United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024) .......................................... 13
*United States v. Zavesky*, 839 F.3d 688 (8th Cir. 2016) ......................................... 48
*Vartelas v. Holder*, 566 U.S. 257 (2012)................................................................... 6
*Villas at Parkside Partners v. City of Farmers Branch*,
726 F.3d 524 (5th Cir. 2013)............................................................................... 18
*Villiers v. Decker*, 31 F.4th 825 (2d Cir. 2022) ...................................................... 22
*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................. 14, 15
*Washington v. Harper*, 494 U.S. 210 (1990)................................................... passim
*Wong Wing v. United States*, 163 U.S. 228 (1896) ............................................... 35
*Young v. Harper*, 520 U.S. 143 (1997)...................................................... 21, 22, 37
*Zadvydas v. Davis*, 533 U.S. 678 (2001) ......................................................... passim
*Zinermon v. Burch*, 494 U.S. 113 (1990) ......................................................... 48, 50

**Statutes**

8 U.S.C. §§1158(a)(1) ............................................................................................ 19
8 U.S.C. §1101(a)(13)(A) ............................................................................................ 6
8 U.S.C. §1182(a)(6)(A)(i) ........................................................................................ 42
8 U.S.C. §1182(a)(9)(B)(iii)(II) ................................................................................. 19
8 U.S.C. §1182(d)(5)(A) ............................................................................................. 24
8 U.S.C. §1225(b)(2)(A) ........................................................................................ passim
8 U.S.C. §1226(c) ................................................................................................ passim
8 U.S.C. §1227 ........................................................................................................... 42
8 U.S.C. §1229a(b) ..................................................................................................... 18
8 U.S.C. §1231(b)(3) .................................................................................................. 19

8 U.S.C. §1255 ........................................................................................ 42
8 U.S.C. §1305(a) ..................................................................................... 23
Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA),
Pub. L. 104-208, 110 Stat. 3009 (1996) ................................................... 6

**Other Authorities**

4 The Debates in the Several State Conventions on the Adoption of the
Federal Constitution (Jonathan Elliot ed., 2d ed. 1836) ........................... 5
5 Annals of Cong. (1798) ........................................................................ 5
Brief for Petitioner, *Jennings v. Rodriguez*, 583 U.S. 281 (No. 15-1204),
2016 WL 5404637 .................................................................................. 28
EOIR Automated Case Information, https://acis.eoir.justice.gov/en/ ................... 3
*J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Mar. 28, 2025),
ECF Nos. 67-10, 67-13 ........................................................................... 43
Office of Inspector General, INS, *Deportation of Aliens After Final Orders*
*Have Been Issued* (Mar. 1996), https://perma.cc/JA5M-VU8P ........................ 32

**Treatises**

1 Edward Coke, *Institutes of the Lawes of England* (1628) ................................ 45
1 Edward Coke, *The Second Part of the Institutes of the Laws of*
*England* (1797) ....................................................................................... 5
1 William Blackstone, *Commentaries* (1765) ........................................... 5, 14
3 William Blackstone, *Commentaries* (1768) ............................................... 46
4 William Blackstone, *Analysis of the Laws of England* (6th ed. 1771) ............... 17
4 William Blackstone, *Commentaries* (1769) ........................................ 16, 17
The Federalist No. 84 (Alexander Hamilton) .................................................. 5

**Regulations**

8 C.F.R. §1.3(a)(5) ..................................................................................... 19
8 C.F.R. §208.18(b) ..................................................................................... 19
8 C.F.R. §212.5(b) ..................................................................... 1, 22, 28, 35
8 C.F.R. §265.1 ........................................................................................... 23

**Constitutional Provisions**

U.S. Const. amend. V ..................................................................... 1, 5, 13, 42

## STATEMENT OF THE ISSUE

Whether the district court correctly concluded that the Due Process Clause did not permit Morozov's re-detention under 8 U.S.C. §1225(b)(2)(A) without that detention serving a constitutionally permissible purpose and without any individualized review.

<u>Relevant Authorities:</u>

- U.S. Const. amend. V
- *Zadvydas v. Davis*, 533 U.S. 678 (2001)
- *Morrissey v. Brewer*, 408 U.S. 471 (1972)
- *Washington v. Harper*, 494 U.S. 210 (1990)
- *Mathews v. Eldridge*, 424 U.S. 319 (1976)

## STATEMENT OF THE CASE

### I. Factual Background

Aleksei Morozov is a Russian citizen who fled to the United States in early 2023, seeking asylum based on his pro-democracy activities opposing the Putin regime. App.64–65, R.Doc.19, at 1–2. After he presented himself at a port of entry on February 4, 2023, DHS granted him humanitarian parole for one year after necessarily finding he presented no risk of flight or danger, allowed him into the United States, and ordered him to appear before an Immigration Judge on April 21, 2027. App.34, R.Doc.14-3, at 2; App.28, R.Doc.14-1, at 1; 8 C.F.R. §212.5(b). DHS

granted Morozov work authorization, for one year, in June 2023. App.65, R.Doc.19, at 2. He timely applied for asylum on December 14, 2023. *Id*. In January 2024, the government extended his work authorization through January 16, 2029. S.App.92–93, R.Doc.18-1. DHS later notified him of an immigration hearing on the non-detained docket on November 16, 2026. App.66, R.Doc.19, at 3.

Morozov has always kept DHS informed of his address and has never missed an immigration hearing. *See* App.65–66, 75, R.Doc.19, at 2–3, 12. He works delivering light freight throughout the United States with a valid driver's license. S.App.94–95, R.Doc.18-4; App.66, R.Doc.19, at 3. He has no criminal history. App.36, R.Doc.14-4, at 2. He is active in his local community and engages in charitable work for children with disabilities and orphanages. S.App.81–91, R.Doc.1-1, at 28–38; App.65, R.Doc.19, at 2.

On November 13, 2025, Morozov was driving through South Dakota for his job when he was arrested following a traffic stop and transferred to Immigration and Customs Enforcement (ICE) custody. App.36, R.Doc.14-4, at 2. He was not charged with any crime. *Id*. The more than five months ICE held Morozov at a local jail caused his family significant hardship: he was the primary breadwinner, his wife has serious medical problems, and his nine-year-old daughter was "deeply affected by the disruption to her home life." S.App.80, R.Doc.1-1, at 17. While he was still detained, an immigration judge denied Morozov's asylum claim, citing deficiencies

with his initial asylum application caused by a former attorney against whom a civil malpractice lawsuit and bar complaint are now pending. App.65, 68, R.Doc.19, at 2, 5; App.7, R.Doc.2. Morozov timely appealed to the Board of Immigration Appeals, App.68, R.Doc.19, at 5, and that appeal remains pending, *see* EOIR Automated Case Information, https://acis.eoir.justice.gov/en/ (search A number and "Russia") (last visited Sept. 4, 2026).

## II. Procedural History

Morozov filed a habeas petition on March 30, 2026, arguing that his detention without any "legitimate governmental purpose" and without "review by a neutral decisionmaker" violated the Fifth Amendment's Due Process Clause. App.1, 3, R.Doc.1, at 1, 3. On April 27, 2026, the district court granted the petition. App.64–77, R.Doc.19. The court found that Morozov had a protected interest in his physical liberty, strengthened by his prior release on parole and continued permission to work while seeking asylum. *Id*. at App.74. It concluded that his detention with "no procedure at all" created a "severe" risk of erroneous deprivation of his liberty. *Id*. at App.74–75 (citation modified). And it found that while the government has a "significant interest" in detaining noncitizens to ensure they do not abscond or present a danger to the community, it "has not detailed any change in [Morozov]'s circumstances to justify its decision [to] detain [him]" and, given Morozov's documented "history of compliance with DHS and no criminal record," his

"continued mandatory detention does not seem to further the Government's interest in ensuring [he] appears at future hearings or protecting the public." *Id*. at App.75. The district court ordered Morozov released. *Id*. at App.77. Respondents noticed appeal on June 5, 2026. Dkt. 5648150.

## III. Due Process and Immigration Detention

All people in the United States, including noncitizens, are entitled to due process before the government may deprive them of their core constitutional right to physical liberty. From common-law tradition, to the Founding, to this day, this principle has remained constant.

### A. Early Protection Against Arbitrary Deprivation of Physical Liberty

The Due Process Clause protects, at a minimum, "those settled usages and modes of proceeding existing in the common and statute law of England." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1855). Freedom from unjustified physical restraint has always been guaranteed. *Holmes v. Jennison*, 39 U.S. 540, 556 (1840) ("The right of personal liberty has existed ever since the first creation of man, and is incident to his nature."). This bedrock principle originates in the Magna Carta, *Kerry v. Din*, 576 U.S. 86, 91 (2015) (plurality opinion), which gave rise to the common-law understanding that "the liberty of a man[']s person" against imprisonment was "more precious to him, than all the rest that follow," 1 Edward Coke, *The Second Part of the Institutes of the Laws of*

*England* 45 (1797). Equally settled at common law was that all people, noncitizens and citizens alike, were entitled to due process, including the core right to liberty. *See* 1 William Blackstone, *Commentaries* *366 (1765) (defining "the people" of England to include "aliens").

The Framers incorporated these principles into the Fifth Amendment's protection of all "person[s]" from deprivations of "liberty" without "due process of law," U.S. Const. amend. V, recognizing that "the practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny," The Federalist No. 84 (Alexander Hamilton). *See also* 5 Annals of Cong. 1956 (1798) (Rep. Gallatin) (underscoring that the Due Process Clause "speaks of persons, not of citizens"). *Accord* 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 2d ed. 1836) 541 (Thomas Jefferson explaining that summarily imprisoning noncitizens would be "contrary to the Constitution['s]" dictate that "'no person shall be deprived of liberty without due process of law'"); *Holmes*, 39 U.S. at 556 ("That the [Due Process Clause] embraces every person within the limits and jurisdiction of the whole Union, will not be denied.").

### B. Modern Statutory Framework for Immigration Detention and Its Constitutional Limits

The late 1800s saw the advent of the modern federal immigration legal regime, introducing for the first time civil proceedings to expel noncitizens already

present in the United States and to turn away, or "exclude," rather than "admit," people seeking to physically enter the country.[1] *See Harisaiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952). These two groups were subject to distinct types of proceedings, with statutes eventually labeling the former "deportation proceedings" and the latter "exclusion proceedings." *Hing Sum*, 602 F.3d at 1100–01. Noncitizens' detention during these proceedings was "the exception, not the rule," and "generally employed only as to security risks or those likely to abscond." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (1996), which reshaped much of immigration law and created the detention framework in effect today. IIRIRA did away with the distinction between exclusion and deportation proceedings, creating one unified "removal proceeding." *See Vartelas v. Holder*, 566 U.S. 257, 261–63 (2012); *Torres v. Barr*, 976 F.3d 918, 927–28 (9th Cir. 2020) (en banc). It also set out detention provisions at 8 U.S.C. §§1225(b), 1226, and 1231(a). Section 1231(a) governs post-removal order detention, while §1226 and §1225(b) govern detention during removal proceedings. As recently construed by this Court,

---

[1] In immigration law, "admission" and "admitted" mean "lawful entry … into the United States after inspection and authorization by an immigration officer." 8 U.S.C. §1101(a)(13)(A); *see Hing Sum v. Holder*, 602 F.3d 1092, 1100–01 (9th. Cir. 2010) (confirming this definition reflects the term's "settled meaning[]" in immigration law).

§1226 applies to noncitizens who have been admitted to the United States, and requires individualized review of their detention, including access to release on bond, unless their criminal history triggers mandatory detention under §1226(c). *Herrera Avila v. Bondi*, 170 F.4th 1128, 1134–37 (8th Cir. 2026). Section 1225(b)(2) applies to unadmitted noncitizens and mandates their detention without individualized review. *Id*.

The Supreme Court has addressed these provisions' constitutionality on various occasions. It has held that because immigration detention implicates the right to physical liberty enumerated in the Due Process Clause, it must be limited to "certain special and narrow" circumstances where a "special justification … outweighs the individual's constitutionally protected interest in avoiding physical restraint," and must also include "strong procedural protections." *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001) (citation modified). The only special justifications the Court has identified are "ensuring the appearance of [noncitizens] at future immigration proceedings" and "[p]reventing danger to the community." *Id*. at 690 (citation modified).

While the Supreme Court upheld detention without individualized review of noncitizens with certain criminal convictions under §1226(c), this was based on evidence in the congressional record showing these criminal convictions were a reasonable proxy for flight risk and danger. *Demore v. Kim*, 538 U.S. 510, 518–21,

531 (2003). The Court has explicitly left open as-applied due process challenges to detention without individualized review under §1225(b)(2). *Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018).

In *Avila*, this Court held §1225(b)(2)(A) applies to all unadmitted noncitizens, including people detained at the border with limited ties to this country and people detained in the interior, even after residing here for years. 170 F.4th at 1134–36. The Court, however, made no constitutional ruling. *See id*. at 1140 n.8 (Erickson, J., dissenting). Multiple other circuit courts have since concluded that detaining certain noncitizens under §1225(b)(2)(A) without any individualized review violates due process. *See Buele Morocho v. Warden Phila. FDC*, No. 26-1150, 2026 WL 2546223, at *8–10 (3d Cir. Aug. 28, 2026); *Sosnava Rodriguez v. Ortega*, 180 F.4th 702 (5th Cir. 2026), *reh'g en banc granted, opinion vacated*, 181 F.4th 608 (5th Cir. 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713, 732–34 (6th Cir. 2026); *see also Barbosa Da Cunha v. Freden*, 175 F.4th 61, 93–96 (2d Cir. 2026) (emphasizing "grave constitutional concerns"); *Cirrus Rojas v. Olson*, 183 F.4th 909, 930–31 (7th Cir. 2026) (same); *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1249–50 (10th Cir. 2026) (same).

## SUMMARY OF ARGUMENT

This case involves an as-applied due process challenge to the re-detention under §1225(b)(2)(A) of a noncitizen who was allowed into the United States to seek

asylum, complied with all conditions of his release, and continued to present no risk of flight or danger. The district court rightly sustained Morozov's challenge. This Court should affirm—and reject Respondents' new arguments on appeal that would broaden this case beyond its facts and controvert settled Supreme Court precedent.

Due process is required if "there exists a liberty or property interest which has been interfered with by the [government.]" *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). As the district court correctly found, Morozov not only has an interest, explicit in the Constitution, in his physical liberty, he also has an independent interest in his continued liberty arising from his prior release on parole and continued permission to live freely in the United States.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court has already found that the government cannot deprive noncitizens of their physical liberty without a "sufficiently strong special justification" and without constitutionally adequate procedures to ensure that justification applies. *Zadvydas*, 522 U.S. at 690, 692; *see also Washington v. Harper*, 494 U.S. 210, 220 (1990). Here, there was neither.

Respondents' arguments to the contrary rest on a foundational error. They claim Morozov's detention does not implicate any *implied* fundamental liberty interest and thus need only be justified by a rational basis. That argument, raised for

the first time on appeal, is forfeited. Regardless, it is wrong. Morozov's right to physical liberty is not implied, it is enumerated in the Constitution. Decades of settled Supreme Court precedent affirms this and dictates that noncitizens can only be deprived of their physical liberty based on a sufficiently compelling special justification: preventing flight risk or danger to the community.

Respondents have never argued that Morozov himself presents these risks, and the district court did not find any justification for his detention. And while in other contexts the Supreme Court has approved the detention of a narrow subset of noncitizens without individualized review based on a robust legislative record establishing a categorical risk of flight or danger, this is not one of those contexts. The §1225(b)(2)(A) congressional record contains no evidence of any such determination as to individuals paroled into this country. Without any individual or categorical justification, Morozov's detention is impermissibly arbitrary.

Moreover, Morozov was entitled to individualized process to assess whether he presented a flight risk or danger. *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003), also newly raised by Respondents on appeal, does not dictate otherwise. *Doe* is a sex-offender registration case that did not involve the deprivation of physical liberty or even any implied fundamental right. Doe was therefore not entitled to extra-statutory process to assess whether his registration served a constitutionally permissible purpose. Morozov's detention, by contrast, implicates

an enumerated right and requires a constitutionally valid justification and adequate procedures regardless of the statutory scheme.

Respondents' new "entry fiction" argument does not change this. The entry fiction only limits certain noncitizens' procedural rights regarding admission into the United States. It does not curb their ability to challenge unconstitutional detention. Nor can it be stretched to eliminate their rights with respect to liberty interests created by conditional release and years of permission to live freely in the United States.

Instead, applying the framework in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the district court correctly held that Morozov's detention without any individualized review to ensure it serves a constitutionally valid purpose violated due process. This Court should affirm. It need not adopt any sweeping holding or bright line rule to do so, and it should reject Respondents' invitation to eliminate the due process rights of every person detained under §1225(b)(2)(A) in this Circuit.

## STANDARD OF REVIEW

"On appeal from a district court's grant of a habeas petition," the Court "review[s] the district court's findings of fact for clear error, and its conclusions of law de novo." *Finch v. Payne*, 983 F.3d 973, 978 (8th Cir. 2020) (citations omitted).

## ARGUMENT

Analyzing due process claims proceeds in two steps: (1) "whether there exists a liberty or property interest which has been interfered with by the [government]," and (2) if so, what process is due. *Thompson*, 490 U.S. at 460. The Due Process Clause requires both that individuals are only deprived of protected liberty interests when "competing state interests" outweigh them, and that there are adequate procedures "for determining that the individual's liberty interest actually is outweighed in a particular instance." *Harper*, 494 U.S. at 220 (quoting *Mills v. Rogers*, 457 U.S. 291, 299 (1982)). And "[t]he procedural protections required … must be determined with reference to the rights and interests at stake[.]" *Id*. at 229. Here, at step one, the district court correctly found that Morozov had been deprived both of his physical liberty and an independent interest in his continued liberty created by his prior release. App.74, R.Doc.19, at 11. At step two, the court could not identify any valid justification for Morozov's detention, and concluded that "no procedure at all" was inadequate. *Id.* at App.74–75. The district court's decision can be affirmed on either ground.[2]

[2] Contrary to Respondents' assertions, OB.33, Morozov does not bring a "facial" challenge to §1225(b)(2)(A); that would require showing that "no set of circumstances exists under which [the statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Morozov does not contest, given the wide applicability of §1225(b)(2), that the statute "is constitutional in some of its applications," *United States v. Rahimi*, 602 U.S. 680, 693 (2024). His claim depends on his "particular situation," *Morrissey*, 408 U.S. at 481, including his prior release,

## I. Morozov Has a Constitutionally Protected Interest in His Liberty.

Despite necessarily finding Morozov presented no flight risk or danger and allowing him to live at liberty in the United States for more than two years, Respondents re-arrested and held him in a county jail for over five months. *See supra* at 1–4. There were no changed circumstances—no criminal wrongdoing or failure to comply with immigration obligations. *Id*. Instead, Morozov had continued to do all DHS asked, and DHS had continued to allow him to live at liberty. *Id*. His subsequent re-detention without any process deprived him of (1) the right to freedom from physical restraint enumerated in the Due Process Clause and (2) the interest in continued liberty created by his previous conditional release and the government's subsequent actions. Both trigger due process protections.

### A. Morozov Has an Enumerated Right to Physical Liberty, and Respondents Forfeited Any Argument Otherwise.

**1.** The Due Process Clause provides that "[N]o person shall be … deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. If "liberty" means anything, it means to be free of physical restraint. *See Din*, 576 U.S. at 99 (describing freedom from physical restraint as "the expressly protected right of liberty under the original understanding of the term" in the Fifth Amendment); 1

---

compliance with release conditions, community ties, and lack of criminal history. The success of other petitioners' claims, regardless of the statute governing detention, must also depend on their "individual circumstances," *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024).

Blackstone, *Commentaries* *134, *136 ("personal liberty" consists of "the power of locomotion … without imprisonment or restraint"—i.e., without "[t]he confinement of the person"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) ("[T]he interest in being free from physical detention" is "the most elemental of liberty interests[.]"); *Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty th[e] [Due Process] Clause protects."); *United States v. Neal*, 679 F.3d 737, 740 (8th Cir. 2012) ("'[L]iberty from bodily restraint has always been recognized as the core of the liberty protected by the Due Process Clause[.]'") (citation omitted).

Here, as the district court correctly found, Morozov's detention infringed his enumerated right to physical liberty, triggering the Due Process Clause. *See* App.74, R.Doc.19, at 11. Respondents never disputed this key element of Morozov's claim below, *see* App.8–21, R.Doc.13, and thus cannot newly argue before this Court that the so-called "substantive due process" test for identifying *implied* fundamental rights articulated in *Washington v. Glucksberg*, 521 U.S. 702 (1997), applies, Opening Brief (OB).23. "'[O]rdinarily, this court will not consider an argument raised for the first time on appeal.'" *Perry v. Precythe*, 121 F.4th 711, 716 (8th Cir. 2024) (rejecting argument defendants failed to raise in district court "despite ample opportunity to do so") (citation omitted). Here, Respondents did not mention *Glucksberg* or substantive due process once before the district court, App. 8–21,

R.Doc.13, and have not invoked any reason this Court should consider those arguments now, thereby forfeiting any such contention, *Chavero-Linares v. Smith*, 782 F.3d 1038, 1040 (8th Cir. 2015).

Regardless, the *Glucksberg* test has no place here. That test is limited to determining, based on "this Nation's history and tradition," what "more" liberty may implicitly entail *beyond* "the absence of physical restraint." *Glucksberg*, 521 U.S. at 719–21; *see also Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) ("Identifying *unenumerated* rights carries a serious risk of judicial overreach[.]") (emphasis added); *Mirabelli v. Bonta*, 607 U.S. 492, 499 (2026) (Barrett, J., concurring) (describing "demanding test for recognizing unexpressed rights"); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (*Glucksberg* requires a "careful description of the asserted right" because recognizing new unenumerated rights requires "judicial self-restraint") (citation omitted).

Unsurprisingly, the Supreme Court has never applied the *Glucksberg* test to civil (including immigration) detention. And it has previously rejected Respondents' argument that the right to physical liberty should be redefined by its specific context—in Respondents' view here, a "right to remain at large in the United States during removal proceedings," OB.23 (emphasis omitted). In *Zadvydas*, the Court explained that the Due Process Clause protects the liberty of noncitizens in the United States *independent* of their right to remain here, dismissing the government's

proposed reframing of the interest at stake as the right to "'liv[e] at large in this country.'" 533 U.S. at 690, 696 (citation omitted); *see also Lopez-Campos*, 175 F.4th at 734 (rejecting re-casting of noncitizens' "liberty interest to be free from detention" as a right "to *enter* the United States or continue to *reside* in the country after entering it"); *Salerno*, 481 U.S. at 746 (defining respondents' interest as right to physical liberty, not right to avoid pretrial detention); *Hamdi*, 542 U.S. at 529–30 (similar, never asking whether there is a history and tradition of allowing citizens deemed enemy combatants to avoid military custody). Rather, "[i]t is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" *Jones v. United States*, 463 U.S. 354, 361 (1983) (citation omitted).

**2.** Even if *Glucksberg* applied and history and tradition were relevant, they support Morozov. Arbitrary detention was anathema to founding principles and remains so today. At the Founding, the Due Process Clause incorporated the English common law guarantee against arbitrary imprisonment; at that time, detention pending legal (particularly civil) proceedings was only employed to ensure appearance or keep the peace. 4 William Blackstone, *Commentaries* *294 (1769) (purpose of pretrial civil and criminal detention was ensuring defendant's "appearance, to answer the charge against him," and where release on bail would "answer the same intention, it ought to be taken," for defendants in "every" civil and

most criminal cases)); 4 William Blackstone, *Analysis of the Laws of England* 148 (6th ed. 1771) (recognizing availability of release on bail "in any Case whatsoever"). "[T]o refuse or delay" release on bail of "any person bailable" was "an offense against the liberty of the subject," in violation of "common law[,] statute[,] and the habeas corpus act." 4 Blackstone, *Commentaries* *294.

At the Founding, immigration proceedings did not exist. Since Congress first created exclusion proceedings in the late 1800s, both federal courts and administrative officers had undisputed authority to release noncitizens during those proceedings, as in the pretrial context. *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1982) (immigration inspector released petitioner to mission house pending exclusion proceedings, despite statute directing detention); *Ex parte Tsuie Shee*, 218 F. 256, 259 (N.D. Cal. 1914) (finding inherent federal court power to order release during exclusion proceedings). Thus, while 1907 saw the first statute authorizing administrative release on bond from immigration detention, OB.24, that law merely expanded available mechanisms for release by "empowering the administrative official to fix bail." *U.S. ex rel. Heikkinen v. Gordon*, 190 F.2d 16, 20 (8th Cir. 1951) (citation omitted), *vacated as moot sub nom. Gordon v. Heikkinen*, 344 U.S. 870 (1952). Ultimately, constitutional rights "are enshrined with the scope they were understood to have *when the people adopted them*." *N.Y. State Rifle &*

*Pistol Ass'n v. Bruen*, 597 U.S. 1, 34 (2022) (citation omitted). The arbitrary detention of a noncitizen was just as counter to the Constitution then as now.

**3.** Beyond improperly invoking *Glucksberg*, Respondents also suggest that Morozov has no right to physical liberty because he could avoid detention by choosing to be deported. OB.40. This is "like telling detainees that they can help themselves by jumping from the frying pan into the fire. Deportation is a 'drastic measure,' often amounting to lifelong 'banishment or exile.'" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 29 (1st Cir. 2021) (citations omitted); *see A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (per curiam) (recognizing that noncitizens threatened with summary removal faced "severe, irreparable harm"). And "[t]he consequences of deportation are potentially most severe for meritorious asylum seekers," like Morozov, "for whom one might fairly say that the escape from detention offered by the government could be death." *Hernandez-Lara*, 10 F.4th at 29. Indeed, our laws specifically protect these individuals from return to harm, *see INS v. Stevic*, 467 U.S. 407, 426 n.20 (1984) (asylum and withholding of removal are "consistent with this country's tradition" and "obligations under international law"), and allow their presence in the country during removal proceedings, *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 530 (5th Cir. 2013) (en banc) (plurality opinion) (federal law "contemplates a non-citizen's residence in the United States until potential deportation"); 8 U.S.C. §1229a(b) (requiring noncitizens' attendance

at removal proceedings); *see also* 8 U.S.C. §1182(a)(9)(B)(iii)(II); 8 C.F.R. §1.3(a)(5); *Doe v. Jamison*, No. 26-cv-1906, 2026 WL 916568, at *6 (E.D. Pa. Mar. 31, 2026) (concluding, based on §1182(a)(9)(B)(iii)(II) and 8 C.F.R. §1.3(a)(5), that "those asylum applicants who have been granted employment authorization … are lawfully present in the United States").

Respondents' position also impermissibly conditions Morozov's pursuit of asylum and related relief—which he is legally entitled to seek, 8 U.S.C. §§1158(a)(1), 1231(b)(3); 8 C.F.R. §208.18(b), *see Mullin v. Al Otro Lado*, 146 S.Ct. 2079, 2088 (2026)—on a deprivation of his liberty without due process. The government "may not impose conditions" on a benefit that "require the relinquishment of constitutional rights," even if it has "power to deny [that benefit] altogether." *Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 593 (1926); *accord L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 805 (8th Cir. 2012). This principle "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). This Court should reject Respondents' attempt to force Morozov to choose between potential death or persecution in Russia and his right to physical liberty.

**4.** Equally erroneous is Respondents' passing suggestion that Morozov's right to liberty is diminished because of Congress's authority over "naturalization and

immigration." OB.24 n.4 (citing *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). Congress's authority in the immigration context does not render it a due-process-free zone. *See Galvan v. Press*, 347 U.S. 522, 532 (1954) (despite the government's political power over immigration, it "must respect the procedural safeguards of due process"); *A.A.R.P.*, 605 U.S. at 96 (similar). And *Diaz*, which also involved noncitizens paroled into the United States, does not support Respondents. While the Court acknowledged that noncitizens are not "entitled to enjoy all the advantages of citizenship," it stressed that "all persons, [noncitizens] and citizens alike," even those "whose presence in this country is unlawful, involuntary, or transitory," are "protected by the Due Process Clause" from "deprivation of life, liberty, or property without due process of law." 426 U.S. at 77–78 (citations omitted); *see Santillan Quiroz*, 180 F.4th at 1250 ("[T]he Supreme Court has never said that due process protections fall away completely in the immigration context. Quite the opposite."). The Due Process Clause thus protects the deprivation of Morozov's physical liberty.

### B. Morozov's Prior Release Created a Strong Interest in His Continued Liberty.

The district court also correctly found that Morozov's liberty interest must be considered in the context of his prior release on parole and the intervening years he was permitted to live freely in this country. *See* App.74, R.Doc.19, at 11. The Supreme Court has repeatedly held that conditional release from physical restraint gives rise to a protected interest in continued liberty, and revocation of that interest

triggers due process protections. *See Morrissey*, 408 U.S. at 481; *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Young v. Harper*, 520 U.S. 143, 147–49 (1997).

In *Morrissey,* the Supreme Court held that an inmate who had been released from prison on parole, but re-incarcerated after his parole was revoked without notice or a hearing, was entitled to constitutional due process. 408 U.S. at 472–73, 482. The Court explained that because "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty"—like living at home, working, being with family, and forming "the other enduring attachments of normal life"—and because its termination "inflicts a 'grievous loss' on the parolee and often on others," its revocation requires due process. *Id.* at 482. "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id*. As such, even if the applicable statute affords officials wide latitude to return a parolee to custody, the government must provide meaningful process to evaluate whether he violated release conditions before stripping his "continued liberty." *Id.* at 481–84.

The Court later extended this reasoning to an individual whose probation was revoked, *Gagnon*, 411 U.S. at 782, and to an inmate incarcerated for murder who was released on pre-parole to reduce overcrowding, *Young*, 520 U.S. at 147–49. The Court found that the Due Process Clause required significant process, including a hearing before a neutral arbiter, to determine whether these individuals violated

release conditions before re-imprisonment. *Morrissey*, 408 U.S. at 485–89; *Gagnon*, 411 U.S. at 782, 786; *Young*, 520 U.S. at 144–45; *accord Edwards v. Lockhart*, 908 F.2d 299, 301 (8th Cir. 1990) ("A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional freedom such that 'the loss of liberty entailed [by its revocation] is a serious deprivation requiring that the [prisoner] be accorded due process.'") (alteration in original) (citation omitted).

Courts regularly assess noncitizens' liberty interests by considering the principles enshrined in *Morrissey* and its progeny. *E.g.*, *Villiers v. Decker*, 31 F.4th 825, 833–36 (2d Cir. 2022) (applying *Morrissey* to determine what process was due where government sought to revoke release of noncitizen); *Muse v. Mullin*, No. 26-cv-4024, 2026 WL 1008532, at *4 (N.D. Iowa Apr. 14, 2026) (applying *Morrissey* to find noncitizen's re-detention violated due process); *see also Zadvydas*, 533 U.S. at 723–24 (Kennedy, J., dissenting) (explaining that "proper analysis" of conditional release from immigration detention "can be informed by our cases involving parole-eligibility or parole-revocation determinations," such as *Morrissey*).

Here, Morozov's conditional release was akin to those in *Morrissey, Gagnon,* and *Young*, and thus his liberty interest is constitutionally protected. DHS released Morozov after finding he was neither a danger nor flight risk. *See* App.34, R.Doc.14-3, at 2; 8 C.F.R §212.5(b) (permitting release on parole only for "'urgent humanitarian reasons' or 'significant public benefit,' provided the [noncitizen]

present[s] neither a security risk nor a risk of absconding"); *cf. Morrissey*, 408 U.S. at 482 (noting that parolee's release involved "evaluation that he shows reasonable promise of being able to return to society"). Morozov was released pending a final decision on his asylum application, on the condition that he continue to participate in removal proceedings and keep Respondents apprised of his whereabouts. App.34, R.Doc.14-3, at 2 (paroled pending 240 hearing); 8 U.S.C. §1305(a); 8 C.F.R. §265.1; *see Morrissey*, 408 U.S. at 481 ("The essence of parole is release from prison … on the condition that the prisoner abide by certain rules[.]").

Before being re-detained for no apparent reason and without any process, Morozov was "allowed to live in the world outside prison walls." *Edwards*, 908 F.2d at 303. For over two years, his parole allowed him to do "a wide range of things," including "gainful[] employ[ment]" and being "with friends and family." *Morrissey*, 408 U.S. at 482. As the district court found, not only did Morozov utilize his freedom to support his wife and daughter, he became deeply integrated in his community. App.65–66, R.Doc.19, at 2–3; S.App.81–91, R.Doc.1-1, at 28–38. He continued to pursue political asylum, attend removal hearings, update his address, and comply with all government requirements while at liberty. App.65–66, 75, R.Doc.19, at 2–3, 12. The district court thus correctly found Morozov's conditional liberty interest was significant. *Id.* at App.74. Indeed, Morozov, who was civilly detained and has no criminal convictions, has a greater liberty interest in his conditional release than

parolees or probationers, whose liberty interests are diminished given their underlying convictions. *See, e.g.*, *United States v. Knights*, 534 U.S. 112, 119 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).

Although Morozov's parole expired on February 3, 2024, OB.32, this supports—not undercuts—his liberty interest. Respondents' initial decision to release Morozov on parole was discretionary, but once Respondents granted him parole, it became irrelevant whether that release was "a 'right' or a 'privilege'"; instead, the inquiry depends on the existence of a protected liberty interest in remaining free. *Morrissey*, 408 U.S. at 482; *see also Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process[.]").

Respondents made no effort to return Morozov to custody for almost two years after his parole expired, despite the parole statute's language, *see* 8 U.S.C. §1182(d)(5)(A). App.26, R.Doc.14, at 1; App.65–66, 74, R.Doc.19, at 2–3, 11. Instead, they doubled down on their "implicit promise" that his conditional liberty would continue because of his compliance, furthering his "justifiable reliance" on his conditional freedom. *Morrissey,* 408 U.S. at 482 & n.8 (citation omitted). Two weeks before Morozov's parole expired, Respondents extended his work authorization for another five years, and in June 2025, after his parole expired, they scheduled another in-person removal hearing in Chicago, for November 2026.

App.65–66, R.Doc.19, at 2–3. The government's choice *not* to return Morozov to custody strengthened his "reasonable understanding" that, absent a significant misstep on his part, he would remain at liberty pending a final decision in his asylum case. *See Hurd v. District of Columbia*, 864 F.3d 671, 682–84 (D.C. Cir. 2017) (finding protected liberty interest even where government mistakenly released person from prison early but he submitted to and completed supervised release requirements). And despite his parole expiration, Morozov is not unlawfully present in the United States and retains the statutory right to reside in this country while his removal proceedings remain pending. *Supra* at 18–19.

Accordingly, the "nature of [Morozov's] interest … in his continued liberty" is strikingly similar to that in *Morrissey*, and is protected by the Due Process Clause. 408 U.S. at 481–82; *see Khutyaev v. Arnott*, 823 F. Supp. 3d 964, 971 (W.D. Mo. 2026) (noncitizen deprived of liberty interest when government revoked parole and re-detained him); *Gonzalez Arias v. Woodbury Cnty. Jail*, No. C26-4041, 2026 WL 1735035, at *3–4 (N.D. Iowa June 16, 2026) (similar); *Strunin v. Garcia*, 827 F. Supp. 3d 976, 988 (S.D. Tex 2026) (similar).

## II. Respondents Can Only Deprive Morozov of His Liberty for a Special Justification, But Never Offered One Here.

The deprivation of Morozov's constitutionally protected liberty interests must serve a "constitutionally adequate purpose." *O'Connor v. Donaldson*, 422 U.S. 564, 574 (1975). The only sufficiently compelling purposes for immigration detention

ever identified are to prevent flight risk and danger. And here, there has been no determination—individualized or categorical—that Morozov's detention serves either purpose.

### A. The Supreme Court Requires a "Special Justification," Not a "Rational Basis," for Immigration Detention.

Only "in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification ... outweighs the 'individual's constitutionally protected interest in avoiding physical restraint,'" and only where there are "strong procedural protections," may civil custody validly infringe a noncitizen's interest in physical liberty. *Zadvydas*, 533 U.S. at 690–91 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) and *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)); *Santillan Quiroz*, 180 F.4th at 1249 (reiterating this framework for immigration detention). This is so because physical liberty is the core right that the Due Process Clause expressly protects. And it directly contradicts Respondents' new, baseless proposition that immigration detention only requires a rational basis, OB.23–24.

Respondents have forfeited the argument that rational basis review applies, having never made that claim below, App.8, R.Doc.13. *See supra* at 14–15; *see also Heller v. Doe*, 509 U.S. 312, 318–19 (1993) (refusing to apply level of scrutiny that party first asserted on appeal because it was not raised below). Regardless, Respondents point to no case in which the Supreme Court has found that deprivation of physical liberty need only be reviewed for rational basis—for there is none.

Despite Respondents' intimation otherwise, OB.24–26, the *Demore* Court did not apply rational basis. Instead, the Court extensively reviewed the specific evidence Congress considered as demonstrating flight risk and danger of the narrow category of noncitizens subject to §1226(c), citing caselaw applying heightened scrutiny. 538 U.S. at 517–22, 528 (citing *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 436–37 (2002)). This is a far cry from deferential rational basis review, in which a legislature "need not 'actually articulate at any time the purpose or rationale supporting its classification,'" which "may be based on rational speculation unsupported by evidence or empirical data." *Heller*, 509 U.S. at 320 (citations omitted). If this were the standard the *Demore* Court applied, it would have said so rather than systematically examining Congress's evidence. 538 U.S. at 517–22.

### B. Immigration Detention is Permissible Only If It Prevents Flight Risk or Danger.

The only "sufficiently strong special justification[s]" for immigration detention the Supreme Court has ever found are to prevent noncitizens from (1) absconding or (2) presenting a danger to the community. *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 527–28 (§1226(c) detention "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings"); *Carlson v. Landon*, 342 U.S. 524, 541–42 (1952) (noncitizen Communists' "support[ ] [for] ... the Party's philosophy concerning violence gives adequate ground for detention"); *see also Leng May Ma*, 357 U.S. at 190 ("Physical

detention of [noncitizens] is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond"); *Buele Morocho*, 2026 WL 2546223, at *9 (similar). *Accord Heikkinen*, 190 F.2d at 19 (where noncitizen detained by immigration authorities, "object of bail is to … secure the appearance of the accused" and "bail will ordinarily be granted unless the enlargement of the accused will be a menace to the public security"). That pretrial detention must serve one of these two purposes has deep common law roots. *See United States v. Ogilvi*e, 153 F.4th 1098, 1110–11 (10th Cir. 2025).

The government has similarly acknowledged that "prevent[ing] [newly arriving noncitizens and convicted criminals] from fleeing or committing crimes during their removal proceedings" are the purposes of §1225(b)(2)(A) detention. Brief for Petitioner at 13, *Jennings*, 583 U.S. 281 (No. 15-1204), 2016 WL 5404637, at *13. The Supreme Court agreed. *Jennings*, 583 U.S. at 286. Respondents offer no other possible justification for Morozov's detention.

### C. Morozov's Re-Detention Is Neither Individually nor Categorically Justified.

Respondents previously determined that Morozov does not present a flight risk or danger. *See* App.34, R.Doc.14-3, at 2; 8 C.F.R. §212.5(b). And they have never "detailed any change in [Morozov]'s circumstances to justify [their] decision" to re-detain him; nor could they, given his undisputed "history of compliance with DHS and no criminal record." App.75, R.Doc.19, at 12. If anything, Morozov now

presents even less of a flight risk or danger, given his meaningful community ties, strong incentive to continue complying with DHS in pursuit of asylum, ability to work lawfully, and continued lack of criminal history. Indeed, the district court found that Morozov's detention did "not seem to further the Government's interest in ensuring [he] appears at future hearings or protecting the public." *Id*. Respondents still do not argue otherwise.

Respondents' sole stated justification for Morozov's detention is that everyone detained under §1225(b)(2)(A) *could* be a flight risk. OB.29–30. As Morozov's case demonstrates, this theory would justify mandatory detention during proceedings for practically all noncitizens, including the most law-abiding. But Respondents' attempt to group this case with those where Congress had made specific, evidence-based determinations regarding a narrow group's particular categorical risks of flight and danger, fails.

**1.** In *Demore*, the Supreme Court upheld §1226(c) mandatory detention only after reviewing Congress's determination that this "limited class" of noncitizens with certain criminal convictions posed a categorical bail risk. 538 U.S. at 518. This determination was well-documented and supported by evidence: before enacting IIRIRA, Congress considered information demonstrating "INS' near-total inability to remove *deportable criminal aliens*," including studies showing this group's abscondment rates and dangerousness. *Id.* at 518–21 (emphasis added). Congress

concluded that "one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain *those* aliens during their deportation proceedings" and for *that* group, detention was essential. *Id.* at 519 (emphasis added). Based on this voluminous record, Congress utilized specific criminal convictions as a categorical proxy for a finding that detention was necessary to guard against this group's danger to the community and failure to appear. *See id*. The Supreme Court stressed that this satisfied due process because "[t]hese convictions ... reflect 'personal activity' that Congress considered relevant to future dangerousness." *Id.* at 525 n.9. The Court viewed Congress's evidence-based findings as a sufficiently individualized assessment for the "subset" of noncitizens subject to §1226(c). *Id.* at 521. The Court also noted that the qualifying convictions are "secured following full procedural protections." *Id*. at 525 n.9.

In *Banyee v. Garland*, this Court interpreted the same narrow statute, §1226(c). 115 F.4th 928, 930 (2024) (noting "criminal offense" and "terrorist activity" grounds for inclusion in §1226(c)) (citation omitted). Only in this specific context did this Court hold that noncitizens subject to mandatory detention under §1226(c) are not entitled to individualized review, even when their detention has become prolonged. *See id.* at 933.

Respondents now attempt to stretch *Demore* and *Banyee* beyond their narrow holdings to present a false dichotomy: deportation is either "practically attainable,"

and thus detention is always constitutionally permissible under *Demore* and *Banyee*, or detention is indefinite, thus falling under *Zadvydas*. *See* OB.25–27. This oversimplification ignores the context of these cases and the Supreme Court's dictate that all immigration detention requires a "sufficiently strong special justification" and adequate procedural safeguards. *Zadvydas*, 135 U.S. at 690; *see also Flores*, 507 U.S. at 316 (O'Connor, J., concurring).

Indeed, *Demore*'s statement that "[d]etention during removal proceedings is a constitutionally permissible part of that process," is necessarily bound to the Court's parallel recognition that detention should serve to prevent flight risk and danger. 538 U.S. at 527–28, 531; *see Lopez-Campos*, 175 F.4th at 732. That some detention is "constitutionally permissible" does not mean detention *without individualized review* is permissible in all circumstances. If that were the case, the Supreme Court would have said so in *Jennings*. *Cf.* 583 U.S. at 312.

Respondents also misleadingly quote *Demore* as stating that detention "pending … removal proceedings … necessarily serves the purpose of preventing [noncitizens] from fleeing'" to suggest that the Court deemed all pre-adjudication mandatory detention justified. OB.26 (modification in original) (quoting 538 U.S. at 527–28). It did no such thing. The actual quote in *Demore* is limited to "deportable criminal [noncitizens]," and is followed immediately by a recognition of the specific

evidence regarding criminal history and high abscondment rates Congress considered in drafting §1226(c). 538 U.S. at 527–28.

Respondents similarly mischaracterize *Banyee* as holding that the Supreme Court "ha[s] already done whatever balancing is necessary" as to *all* mandatory detention. OB.41 (quoting 115 F.4th at 933). But the *Banyee* Court was referring solely to §1226(c) detention, the balancing done in *Demore*, and the congressional record justifying that scheme. For individuals like Morozov, who had *authorization* to come into the United States at a port of entry and lived here incident-free for over two years, Respondents point to nothing indicating a parallel evidence-based consideration by Congress in adopting §1225(b)(2)(A). *See Demore*, 538 U.S. at 518–21.

Respondents point only to a 1996 Department of Justice Inspector General report, OB.29, which was never mentioned in the IIRIRA legislative reports and focuses on noncitizens with final removal orders, Office of Inspector General, INS, *Deportation of Aliens After Final Orders Have Been Issued* (Mar. 1996), https://perma.cc/JA5M-VU8P ("OIG Report"). It also does not say that 90% of noncitizens in proceedings absconded, OB.29; it states that INS only deported about 11% of noncitizens ordered deported, but attributes that rate to multiple factors including the government's own "failure to send surrender notices," OIG Report. And it nowhere mentions a risk of danger or flight specific to noncitizens, like

Morozov, who present at ports of entry and are released by immigration authorities to seek asylum, especially those who then develop strong ties within the country.

**2.** The Supreme Court's decision in *Carlson* also does not help Respondents. *Carlson* represents a narrow circumstance in which a targeted, evidence-based congressional finding—that Communist activity was categorically dangerous—justified discretionary denial of release on bail for active Party participants, satisfying the Fifth Amendment. 342 U.S. at 543–44. A "[m]andatory detention" statute, OB.27, was not at issue. Rather, the Attorney General considered the petitioners for bail, but decided not to release them, concluding that, regardless of any other individual risk factors, their level of Communist Party participation alone sufficed to deny release. *Carlson*, 342 U.S. at 528–534; *contra* OB.27. The petitioners argued this was insufficient to demonstrate individual risk of danger, and there had also been no determination that they posed a flight risk, making their detention unconstitutional. *See Carlson*, 342 U.S. at 529–530, 532.

In reversing, the Court reviewed the denials "by reference to the legislative scheme," noting that the denials were "within the framework of the Subversive Activities Control Act," which was narrowly aimed at "eradicat[ing] the evils of Communist activity," *id*. at 543–44. The Court considered "the legislative judgment of evils" and purpose of the Act, observing that where a noncitizen "Communist may so conduct himself" so as "to inculcate the doctrine of force and violence into the

political philosophy of the American people," "*that* [noncitizen] may be detained." *Id.* at 544 (emphasis added).[3] The Court stressed that "Congress had before it evidence of resident aliens' leadership in communist domestic activities sufficient to furnish reasonable ground for action against alien resident Communists." *Id.* at 536; *see also id.* at 541 ("Congress' understanding of [Communists'] attitude toward the use of force and violence … gives adequate ground for detention.").

Even then, the Fifth Amendment required "a reasonable apprehension of hurt from [noncitizens] charged with a philosophy of violence" based on past actions. *Id*. at 542. Thus, bail denial was only appropriate because there was "evidence of [the petitioners' Party] membership plus [their specific] personal activity in supporting and extending the Party's philosophy concerning violence." *Id.* at 541; *see Hernandez-Lara*, 10 F.4th at 36 (noting *Carlson* petitioners had not been found to be flight risks); *contra* OB 27–28 (mischaracterizing *Carlson* as authorizing any statutory detention scheme without individualized assessment). The Court made clear that "[o]f course purpose to injure could not be imputed generally to all aliens subject to deportation." *Carlson*, 342 U.S. at 538. This reasoning supports Morozov's position that his detention absent any finding of danger or flight risk *does* violate the Fifth Amendment.

[3] The Court also pointed out that the petitioners had multiple opportunities to challenge the denials, including through judicial review. *Id*. at 529–32, 540.

Overall, the detention at issue in *Demore*, *Banyee*, and *Carlson* covered a "limited class" of noncitizens whom Congress had determined, based on evidence, presented a categorical bail risk. *Demore*, 538 U.S. at 518; *see Banyee*, 115 F.4th at 930–31. Conversely, §1225(b)(2)(A) as construed in *Avila*, 170 F.4th at 1134, is anything but narrowly drawn, covering approximately two million noncitizens when enacted (and likely millions more today) based solely on their statutory status as "applicants for admission," *id.* at 1138 (Erickson, J., dissenting). Flight risk and danger cannot simply be "imputed generally to all" such noncitizens. *See Carlson*, 342 U.S. at 538. There must thus be an individualized inquiry into whether a permissible purpose justifies Morozov's indiscriminate, status-based detention.[4]

**3.** The Supreme Court's decision in *Flores* is inapposite for a different reason. *Flores* involved infringement of a non-enumerated interest that the Court found not constitutionally protected at all: the "novel[]" proposed right of children "not to be placed in a decent and humane custodial institution if there is … a responsible person" temporarily available but "unwilling to become the child's legal guardian." *See* 507

[4] The statement in *Wong Wing v. United States*, 163 U.S. 228, 235 (1896), that detention is permissible "pending the inquiry into [a noncitizen's] true character," *see* OB.16, also supports Morozov. There, the Court compared immigration detention pending proceedings to pretrial detention, *see Wong Wing*, 163 U.S. at 235, which then, like today, encompassed individualized consideration for pretrial release as the default. Here, Morozov has *no* access to such an inquiry. Moreover, Respondents *already* performed an inquiry into Morozov's "true character," and after that inquiry chose to release him. App.34, R.Doc.14-3, at 2; 8 C.F.R. §212.5(b).

U.S. at 302–03. Although the children were in government custody, this did not infringe their right to freedom from physical restraint, the Court held. *Id*. at 302. This was both due to the nature of the humanitarian facilities and the fact that the petitioners were children, which meant that, in the absence of a parent or legal guardian, the government "*must* … either exercise custody itself or appoint someone else to do so." *Id.* The Court explicitly distinguished adult detention, which *does* implicate the right to "freedom from physical restraint." *Id.*

Nonetheless, the custody scheme at issue in *Flores* still required individualized determinations of flight risk and danger. *Id*. at 297, 313. The Court only rejected *additional* determinations sought by the children, *see* OB.27–28, regarding whether a private placement with a non-legal guardian was in the child's best interest. *Flores*, 507 U.S. at 313–14. On that question, the Court allowed reliance on "reasonable presumptions and generic rules" in furtherance of "protect[ing] the welfare of juveniles." *Id.* at 312–13. Even so, those "reasonable presumptions" were grounded in an evidence-based consideration that "state guardianship procedures" are a reliable proxy for safety. *Id.* at 312 n.7. Thus, while *Flores* employed rational basis review, given the non-fundamental interest at stake, it was still considerably more demanding than what Respondents propose here.

Ultimately, because Morozov's detention infringed his core enumerated right to physical liberty without any individualized or categorical determination of flight

risk or danger (in fact the record shows the opposite, App.75–76, R.Doc.19, at 12–13), the decision below should be affirmed on the ground that Respondents failed to provide any "special justification" for Morozov's detention.

## III. Respondents Can Only Deprive Morozov of His Liberty with Adequate Procedures, But Provided None Here.

In addition to requiring a "constitutionally adequate purpose," *O'Connor*, 422 U.S. at 574, the deprivation of Morozov's physical liberty independently required "constitutionally adequate procedures" to ensure such a purpose is satisfied, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *Harper*, 494 U.S. at 220. In the civil detention context, the Supreme Court has repeatedly conditioned the deprivation of liberty on individualized process, *see Addington v. Texas*, 441 U.S. 418, 426–27 (1979); *Salerno*, 481 U.S. at 747, 751; *Foucha*, 504 U.S. at 80–82; *Zadvydas*, 538 U.S. at 690, with limited exceptions not applicable here, *see supra* at 29–36. The Court has equally held that re-detaining individuals previously conditionally released requires procedural protections. *See Young*, 520 U.S. at 147–48; *Gagnon*, 411 U.S. at 782; *Morrissey*, 408 U.S. at 482.

The absence of any individualized process thus violates Morozov's procedural due process rights. *See Jenner v. Nikolas*, 828 F.3d 713, 717 (8th Cir. 2016) (explaining "[t]he process of providing an unbiased and impartial tribunal … exists to afford due process when … required to protect a liberty interest" and "*is* procedural" in nature). The Court should ignore most of Respondents' arguments to

the contrary because they are forfeited: Respondents made no mention of *Connecticut Department of Public Safety v. Doe*, the entry fiction, or the purported irrelevance of *Mathews v. Eldridge* before the district court, App.8–21, R.Doc.13. Regardless, each argument fails.

### A. *Doe* Does Not Preclude Morozov from Seeking Additional Process.

For the first time on appeal, Respondents argue that *Connecticut Department of Public Safety v. Doe* forecloses Morozov's procedural due process claim because he is seeking process to prove facts (flight risk and danger) "irrelevant to the statutory scheme." OB.18–20. This argument is forfeited and wrong. *Doe* is a sex-offender registry case that did not implicate any enumerated constitutional rights, and the Supreme Court has never used it to evaluate the constitutionality of detention. It has no bearing here, where physical liberty is at stake such that the Constitution requires adequate purpose and meaningful process, regardless of any statute. *See Buele Morocho*, 2026 WL 2546223, at *9 n.29 (rejecting *Doe*'s applicability in similar case).

The plaintiff in *Doe* challenged a state law requiring registration and public disclosure of information about individuals convicted of sex offenses. He claimed that the inability to present evidence related to his *current* dangerousness before this disclosure violated his procedural due process rights, asserting a reputational injury. 538 U.S. at 4–6. But the law turned exclusively on the fact of a *past* conviction; the

registry explicitly stated that officials had not assessed registrants' current dangerousness. *Id.* at 4–5, 7.

Crucially, Doe did not raise a "substantive challenge" to the state law—i.e., he never argued that requiring registration of non-dangerous individuals violated the Constitution. *Id.* at 7–8. Even if he had, his only liberty interest turned on a defamatory injury, not an enumerated constitutional right. *Id.* at 6; *id.* at 8–9 (Scalia, J., concurring). Because Doe did not assert any statutory or constitutional basis why he could not have been placed on the registry even if additional process proved he was not currently dangerous, his procedural claim failed. *Id.* at 7–8.[5]

The reputational injury Doe asserted bears no resemblance to the enumerated right to physical liberty Morozov asserts. *See Din*, 576 U.S. at 91. The Supreme Court has long recognized that the Constitution requires any infringement of this right be justified by an adequate purpose (here, flight risk or danger), *see supra* at 25–28, and that to evaluate whether such a purpose is being served, there must be adequate procedures, *see supra* at 37. Unlike Doe, Morozov argued that the Constitution requires his re-detention under §1225(b)(2)(A) serve an adequate

[5] Similarly, in *Michael H. v. Gerald* and *Reno v. Flores*, OB.20, the Supreme Court rejected the plaintiffs' assertions of implied, unenumerated interests and, because their interests were not constitutionally protected, also rejected their related claim that they were owed additional process before those interests could be infringed. *Michael H. v. Gerald D.*, 491 U.S. 110, 122–27 (1989) (plurality opinion); *Flores*, 507 U.S. at 302–08.

purpose, which it did not, and that there be adequate procedures to test that purpose, which he did not receive. App.1, 3, R.Doc.1 at 1, 3; *cf. Doe*, 538 U.S. at 7. No statute can limit these requirements. *See Doe*, 538 U.S. at 8 (Scalia, J., concurring). Otherwise, Congress could simply legislate away the Due Process Clause's procedural guarantees. *See Counselman v. Hitchcock*, 142 U.S. 547, 565 (1892) ("Legislation cannot detract from the privilege afforded by the Constitution."); *Collins v. Yellen*, 594 U.S. 220, 259 (2021) (statutes must yield to the Constitution).

Supreme Court jurisprudence reflects this principle. In *Foucha*, a statute permitted the detention of people who had been found innocent by reason of insanity if they were dangerous. 504 U.S. at 73. The Supreme Court held that the Constitution only permits the detention in this context when an individual is both dangerous *and* presently mentally ill (an extra-statutory criterion), and that the government must prove both factors in a hearing. *Id.* at 78–80. That parallels Morozov's substantive and procedural challenges. And in *Morrissey*, a law provided that parolees were "subject, at any time, to be taken into custody and returned" to prison, without specifying any criteria for parole revocation. 443 F.2d 942, 945 (8th Cir. 1971), *rev'd*, 408 U.S. at 490. Yet the Supreme Court found that regardless of the lack of statutory criteria, as a constitutional matter a "parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole," and thus revocation is only justified where a "parolee has in fact acted in violation of" those conditions.

408 U.S. at 479; *see also id.* at 483–84. The Court then analyzed the process necessary to assess this substantive rationale in an individual case. *Id.* at 484–89. This is exactly what the district court correctly did here.

### B. The "Entry Fiction" Does Not Bar Morozov's Right to Adequate Process.

Respondents also newly and unsuccessfully raise something akin to the "entry fiction" to argue that Morozov effectively remains stopped at the border, limiting his procedural due process rights to "the procedures Congress has provided in statute." OB.34–37. Not only is this "entry fiction" argument based on an erroneous description of the relevant doctrine,[6] it fails because the fiction only limits noncitizens' procedural rights regarding their *admission*, not their standalone challenges to detention. Therefore, using the entry fiction to bar Morozov's request for process to prevent unjustified deprivation of his liberty makes no sense.[7]

---

[6] Respondents' argument that the entry fiction applies to any person who has never been *admitted*, OB.34–36, is wrong. The entry fiction is only potentially relevant if there has been *no* "entry;" it does not turn on the legality of entry (i.e., whether it constituted an admission). *See Barbosa da Cunha*, 175 F.4th at 85 ("[I]t has long been settled that a noncitizen can effect an entry even by crossing the border illegally."); *Sosnava Rodriguez*, 180 F.4th at 712–16 (concluding Respondents' description of the entry fiction is "a complete fantasy").

[7] In addition to being limited to admission, Respondents are correct, *see* OB.34–37, that the entry fiction only ever relates to *procedural* due process. *See DHS v. Thuraissigiam*, 591 U.S. 103, 139–140 (2020) (explaining that the entry fiction limits "procedures" "regarding admission"); *Rosales-Garcia v. Holland*, 322 F.3d 386, 410 (6th Cir. 2003) (explaining that noncitizens who have not "entered" retain rights under the substantive component of the due process clause); *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987) (similar). Thus, Respondents'

Respondents cite no authority applying the fiction in a case like this, where the government's actions indicated that conditional release would continue absent a violation of conditions, but it then arbitrarily re-detained the person. And Respondents offer no reasoned basis to expand the entry fiction to circumvent the Fifth Amendment's core demand that "[n]o person shall … be deprived" of "liberty" "without due process of law[.]" U.S. Const. amend. V.

Courts have long recognized that removal proceedings implicate constitutionally protected interests, such that "'the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) (citation omitted); *accord Al Khouri v. Ashcroft*, 362 F.3d 461, 464 (8th Cir. 2004). "The entry fiction" is a narrow carveout to the otherwise broad territorial application of constitutionally derived procedural due process principles. It is based on the idea that Congress has "plenary authority to decide" whether to "admit or exclude"[8] a noncitizen "seeking initial

---

invocation of the entry fiction does not impact Morozov's argument that his detention is unconstitutional because it does not serve a compelling purpose.

[8] Prior admission or parole gives rise to extensive immigration law consequences. *See, e.g.*, 8 U.S.C. §1227 (deportability grounds applicable only to those previously admitted); *id.* §1255 (adjustment of status available if a person "was inspected and admitted or paroled"); *id.* §1182(a)(6)(A)(i) (presence without admission or parole is a basis for removal).

Admission is distinct from "entry" generally. *See Nyirenda v. INS*, 279 F.3d 620, 623 (8th Cir. 2002) (restating the long-established definition of "entry," requiring

entry," and "a concomitant of that power is the power to set the procedures to be followed in determining whether a [noncitizen] should be admitted." *Thuraissigiam*, 591 at 139. Therefore, when immigration officials stop noncitizens at the border, they may physically enter the country for inspection and related proceedings, but still be fictively understood not to have effected an "entry;" and this is "determinative of the[ir] *procedural* rights … *with respect to their applications for admission*." *Alvarez-Garcia v Ashcroft*, 378 F.3d 1094, 1098 (9th Cir. 2004) (second emphasis added) (citation omitted); *accord Thuraissigiam*, 591 U.S. at 140 (applying entry fiction to limit noncitizen's rights "regarding admission").

But the fiction—to the extent it remains good law at all[9]—stops there. It affects procedural rights regarding admission and nothing more. Constitutional procedural due process requirements still attach to government infringement of other constitutionally protected interests, even for people who have not effected an entry. *E.g.*, *Diaz*, 426 U.S. at 77 (enforcing procedural due process rights, unrelated to

---

either (1) inspection and admission *or* (2) evasion of inspection and freedom from official restraint); *Matter of Pierre*, 14 I. & N. Dec. 467, 468 (BIA 1973) (same).

[9] The Supreme Court recently held that constitutional procedural due process applies to removal proceedings in a case that included noncitizens who had arrived at ports of entry like Morozov. *J.G.G.*, 604 U.S. at 673; *see, e.g.*, *J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Mar. 28, 2025), ECF Nos. 67-10, 67-13 (describing class members' parole at ports); *see also A.A.R.P.*, 605 U.S. at 94 (stressing that "'*no* person shall be' removed from the United States 'without opportunity, at some time, to be heard'" (emphasis added) (citation omitted)).

admission applications, of noncitizens paroled into the country). As such, the entry fiction does not bar procedural due process challenges to deprivations of the core right to physical liberty, which do not implicate the procedures for determining whether a noncitizen "should be admitted." *Thuraissigiam*, 591 U.S. at 139; *see Jennings*, 583 U.S. at 294 (in habeas action challenging constitutionality of §1225(b)(2) detention, noncitizens were not "challenging any part of the process by which their removability will be determined"); *Khasanova v. Rokosky*, No. 26-cv-763, 2026 WL 1815723, at *3–5 (D. Ariz. June 24, 2026) (entry fiction inapplicable to detention challenge); *Fils-Aime v. FCI Berlin, Warden*, 808 F. Supp. 3d 218, 223 (D.N.H. 2025) (similar).

Morozov sought admission at a port of entry and was granted parole. This did not constitute "entry" under the historical understanding. *Thuraissigiam*, 591 U.S. at 139. But his parole then expired, and he continued to live in the United States with the government's knowledge and approval for over two years. Respondents cite no authority applying the entry fiction after parole expiration. Even if it were applicable, at most it would mean the Fifth Amendment would not demand additional procedures regarding Morozov's *request for admission* beyond those provided by Congress. Such a result has no impact here, however, because Morozov solely challenged his detention; unlike Thuraissigiam, he "does not invoke any 'rights

regarding admission'" *Khasanova*, 2026 WL 1815723, at *3 (quoting *Thuraissigiam*, 591 U.S. at 140).

Extending the entry fiction here would also be wholly untethered from its purpose. *See Zadvydas*, 533 U.S. at 703–04 (Scalia, J., dissenting) (the entry fiction only "makes perfect sense … with regard to the question of what procedures are necessary to prevent entry"); *Thuraissigiam*, 591 U.S. at 139–40 (rejecting argument that "disregards the reason for" the fiction, which serves Congress's "'sovereign prerogative' of governing admission to this country" (citation omitted)); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (similar). Application of the fiction to procedural due process challenges to custody makes no sense, where noncitizens have an enumerated right to be free of arbitrary custody, in contrast to their *lack* of any constitutional right to admission. Thus, because "the rationale of [this] legal rule [is] no longer … applicable, [the] rule itself no longer applies." *Zadvydas*, 533 U.S. at 699 (citing 1 Edward Coke, *Institutes of the Lawes of England* *70b (1628)).

Respondents would instead have the Court believe the purpose of the entry fiction is to protect the government's power to arbitrarily detain people on U.S. soil, or even to arbitrarily *re-detain* people in civil proceedings when they have not violated any condition of release. But "the proper use of legal fiction is to prevent injustice," such that "no fiction ... shall extend to work an injury." *Union Refrigerator Transit Co. v. Commonwealth of Ky.*, 199 U.S. 194, 208 (1905)

(quoting 3 William Blackstone, *Commentaries* *43 (1768)). Respondents' claimed power would violate founding principles, *see supra* at 16–18, and ignore the Supreme Court's admonition that even plenary power is subject to "important constitutional limitations," *Zadvydas*, 533 U.S. at 695.

It is thus unsurprising that none of Respondents' cited cases applied the entry fiction to justify process-free re-detention, without any individualized flight- or danger-related rationale, while an asylum-seeker's parole had expired and the government's own conduct demonstrated conditional liberty would continue. *See Thuraissigiam*, 591 U.S. at 138–40 (entry fiction limited due process rights regarding request for admission); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544–47 (1950) (upholding constitutionality of statute delegating to the Executive Branch power to exclude without a hearing noncitizens at the border who had not effected entry); *Nishimura Ekiu*, 142 U.S. at 661 (same, explaining that being permitted to stay in a mission-house pending proceedings did not give petitioner a right to admission); *Kaplan v. Tod*, 267 U.S. 228, 230–31 (1925) (child who had been ordered excluded at Ellis Island but was temporarily allowed to stay in a shelter pending removal did not, as a result, transform into a lawfully admitted resident with statutory path to citizenship); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210–16 (1953) (holding noncitizen ordered excluded on national security grounds and continuously detained at Ellis Island was not entitled

to more process regarding exclusion than set by Congress, and simultaneously denying request for release because "to admit a [noncitizen] *barred from entry on national security grounds* nullifies the very purpose of the exclusion proceeding" (emphasis added)); *Plasencia*, 459 U.S. at 32–34 (declining to apply entry fiction where returning lawful permanent resident was only statutorily entitled to exclusion proceedings, instead concluding she was constitutionally due additional process regarding her application for admission).

The "growing consensus" among courts is that the entry fiction does not bar procedural due process challenges to similarly arbitrary re-detention. *Kortiev v. Rodriguez*, No. SA-26-CA-00971, 2026 WL 754843, at *7 (W.D. Tex. Mar. 13, 2026); *e.g.*, *Rincon v. Hyde*, 810 F. Supp. 3d 101, 110–13 (D. Mass. 2025) (noting "the Supreme Court has never applied the entry fiction doctrine to … constitutionally justify the detention of a person living freely, for years, within the United States"); *Gomez Vera v. De Anda-Ybarra*, No. 1:26-CV-01491 2026 WL 2031690, at *4 (D.N.M. July 14, 2026) (finding petitioner's ties to the United States arising from years residing here "afford him rights that the entry fiction cannot erase"); *Strunin*, 827 F. Supp. 3d at 984–88 (rejecting "extension" of entry fiction to parolee). This Court too should reject Respondents' request for an unprecedented expansion of the entry fiction at the expense of the Constitution.

### C. The District Court Appropriately Applied *Mathews* to Assess What Process Is Required.

Because a procedural due process claim is plainly available here, the district court correctly applied *Mathews v. Eldridge* to determine what process is due. Before the district court, Respondents conceded that this Court has "acknowledge[d] that deciding what process is due ordinarily requires a form of interest balancing under *Mathews v. Eldridge*[.]" App.13–14, R.Doc.13, at 6–7 (citing *Banyee*, 115 F.4th at 933). On appeal, Respondents newly claim that *Mathews* "has no operation in the immigration context." OB.37. That argument is forfeited and mistaken.

The Supreme Court has consistently applied *Mathews* to assess what process is necessary for a person to be constitutionally "deprived of life, liberty, or property." *Hamdi*, 542 U.S. at 529–534 (applying *Mathews* to assess whether enemy combatants are entitled to hearing to contest continued detention); *see also Addington*, 441 U.S. at 425–33 (applying *Mathews* to assess adequacy of burden of proof in civil commitment proceedings); *Schall v. Martin*, 467 U.S. 253, 274 (1984) (applying *Mathews* to assess adequacy of juvenile pretrial detention procedures); *Zinermon v. Burch*, 494 U.S. 113, 127–28 (1990) (indicating *Mathews* is proper test to assess civil commitment procedures).

So too has this Court. *See United States v. Zavesky*, 839 F.3d 688, 694 (8th Cir. 2016) (applying *Mathews* to assess adequacy of procedures for committing individual for inpatient competency evaluation); *Franco v. Moreland*, 805 F.2d 798,

800–01 (8th Cir. 1986) (noting that "once a liberty interest has been found," *Mathews* determines "what process is due"); *Banyee*, 115 F.4th at 933 (acknowledging that "deciding what process is due" in detention challenge "ordinarily requires a form of interest balancing" per *Mathews*, but finding this not required in §1226(c) context given *Demore*).

The alternative test Respondents propose, from *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), has only ever been applied by the Supreme Court to evaluate due process challenges specifically "regarding the adequacy of the method used to give notice." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002) (applying *Mullane* to assess sufficiency of property forfeiture notice). Similarly, in both *A.A.R.P.* and *J.G.G.*, the Supreme Court considered the adequacy of the notice given to individuals subject to the Alien Enemies Act. *A.A.R.P.*, 605 U.S. at 95; *J.G.G.*, 604 U.S. at 673. Neither Respondents, nor the D.C. Circuit in *Make the Road New York v. Mullin*, 179 F.4th 16, 33–34 (D.C. Cir. 2026), *see* OB.37–38, explain why *Mullane* would apply when sufficiency of notice is *not* the central question. Indeed, the Supreme Court has applied *Mullane* to assess the adequacy of notice, then in the same case applied *Mathews* to determine the "specific dictates of due process." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13–15, 17–18 (1978) (citation omitted). This Court has done the same. *See Bliek v. Palmer*, 102

F.3d 1472, 1476–77 (8th Cir. 1997) (applying *Mullane* to find notice given was inadequate and *Mathews* to determine what notice would be adequate).

While it is undisputed that Morozov received no notice regarding his re-detention, the crux of this case is whether failing to provide *any* meaningful process when depriving him of his liberty satisfies due process. Unsurprisingly, Respondents do not cite, nor is Morozov aware of, any case applying *Mullane* to assess what process is due under these circumstances.

### D. Under Either *Mathews* or *Mullane*, Morozov Never Received Adequate Process.

Where enumerated rights are implicated, "the [Supreme] Court usually has held that the Constitution requires some kind of hearing before the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127; *see Foucha*, 504 U.S. at 79; *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Moore v. Warwick Pub. Sch. Dist. No. 29*, 794 F.2d 322, 326–27 (8th Cir. 1986); *cf. Salerno*, 481 U.S. at 750; *Addington*, 441 U.S. at 425–27. The district court thus unsurprisingly found that the *Mathews* factors weigh in Morozov's favor, correctly concluding that (1) Morozov's weighty interest in his continued liberty and (2) the risk of the erroneous deprivation of that liberty without any process whatsoever, outweighed (3) the government's interest in detaining him given his history of compliance and lack of criminal record. App.73–76, R.Doc.19, at 10–13. Rather than substantively engaging with these factors, Respondents simply repeat the meritless assertions discussed *supra*. As

those all fail, so too does any attempt to undermine the district court's *Mathews* balancing.

Considering the first factor, freedom from physical detention is "the most elemental of liberty interests." *Hamdi*, 542 U.S. at 529. Respondents' attempt to narrow this right out of existence, OB.40, defies Supreme Court precedent and common sense. *See supra* at 15–16. Regardless, Morozov also has additional "rights and interests" in liberty. *Harper*, 494 U.S. at 229. He has lived in this country for over two years after the government allowed him to come in and work lawfully while pursuing asylum, thereby creating an independent interest in his "continued liberty." *Morrissey*, 408 U.S. at 482; *see supra* at 23–25. During this time, he developed "significant" community ties, App.74, R.Doc.19, at 11, and he has the statutory right to remain pending removal proceedings, *see supra* at 18–19. The first factor thus weighs heavily in Morozov's favor.

Second, Respondents re-detained Morozov with no process at all, making the risk of the erroneous deprivation of his liberty "severe." App.74, R.Doc.19, at 11. With "not … even [a] minimal" opportunity to be heard on whether his detention was justified, erroneous deprivation was in fact "a virtual certainty." *See Kroupa ex rel. B.K. v. Nielsen*, 731 F.3d 813, 820 (8th Cir. 2013). This is especially so since Respondents already necessarily found Morozov to present no flight risk or danger and have never even suggested otherwise. *See supra* at 28. As such, *any* additional

procedural safeguards, such as a hearing in front of a neutral arbiter, would protect against erroneous deprivation of his liberty interests. Respondents' only argument otherwise is that detention is never erroneous where §1225(b)(2)(A) applies. OB.40. But the Constitution requires more, *see supra* at 25–28; and the lack of process here all but ensures the Constitution's demands are not satisfied. This factor thus also favors Morozov.

Finally, while the government has valid interests in enforcing immigration law, protecting the community, and ensuring noncitizens can be removed if so ordered, Respondents have not explained why re-detaining Morozov serves these interests, nor why they cannot provide basic process to ensure these interests are met. *See Morrissey*, 408 U.S. at 483 ("[T]he State has no interest in revoking parole without some informal procedural guarantees."). Respondents' argument that Congress's "judgment" that Morozov be mandatorily detained must "weigh heavily," OB.41, fails. The mere fact that a "law … authorize[s] confinement … does not itself establish a constitutionally adequate purpose for the confinement." *O'Connor*, 422 U.S. at 574. Moreover, Respondents "ha[ve] not argued" that providing Morozov with process would be "unduly burdensome," *Buele Morocho*, 2026 WL 2546223, at *10, effectively conceding it would not be. That makes sense, given that unnecessary mandatory detention likely costs millions of taxpayer dollars per year, *see Hernandez*, 872 F.3d at 996; *Betancourth v. Tate*, 822 F. Supp. 3d 762, 770 (S.D.

Tex. 2026), and Morozov's detention causes "exceptionally severe consequences" by removing a productive member of society from his family and community, *Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018) (citation omitted).

In sum, all three *Mathews* factors sharply favor Morozov. The same conclusion would result even under Respondents' characterization of the *Mullane* test. Per *Mullane*, "notice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314. The Supreme Court has repeatedly held that prompt, pre-deprivation notice is required to strip someone of their interest in continued liberty. *E.g.*, *Morrissey*, 408 U.S. at 486–87; *see also Schall*, 467 U.S. at 277. Morozov received *no* notice, and thus, more fundamentally, no "opportunity to be heard … at a meaningful time and in a meaningful manner," *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citations omitted). This cannot satisfy *Mullane*, which requires notice reasonably calculated to allow objection. 339 U.S. at 314.

Respondents' only argument is that (1) noncitizens' ability to challenge whether §1225(b)(2)(A) applies to them at all, and (2) the process noncitizens receive in their removal proceedings, are somehow adequate. OB.38–39. The first claim impermissibly elevates the statute above the Constitution, *see supra* at 39–41. The second is like suggesting that mandatory pretrial detention is permissible for all

defendants because they receive due process in their criminal proceedings, which is wrong. *Cf. Salerno*, 481 U.S. at 743, 754 (upholding pretrial detention based on dangerousness only after a "detention hearing" with "numerous procedural safeguards"). Like criminal defendants, noncitizens have no opportunity in removal proceedings to challenge the validity of detention. *See Jennings*, 583 U.S. at 293 (explaining that immigration detention challenges are distinct from challenges to removal). And if due process in removal proceedings were sufficient to dispose of any detention challenge, the Supreme Court could have decided both *Demore* and *Jennings* on this ground without further analysis. *Make the Road* is inapposite; the issue there was whether removal procedures themselves satisfied due process, so adequate notice of those procedures and the opportunity within those procedures to contest removal satisfied *Mullane*. 179 F.4th at 34–37. This case is not about removal procedures, and Respondents agree that Morozov had *no* opportunity to challenge his detention. OB.39.

Under any test, Morozov's detention without any process violates the Constitution.

**CONCLUSION**

For all the reasons above, the Court should affirm the decision below.

Dated: September 8, 2026 | Respectfully submitted,

James D. Leach
Attorney at Law

/s/ *Stephanie E. Norton*
Stephanie E. Norton*

1617 Sheridan Lake Rd.
Rapid City, SD 57702
(605) 341-4400
jim@southdakotajustice.com

Rebecca Cassler
Suchita Mathur
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L Street NW, Suite 500
Washington, DC 20036
(202) 507-7514
rcassler@immcouncil.org
smathur@immcouncil.org

Gracie Willis‡
Yulie Landan+
NATIONAL IMMIGRATION PROJECT
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
(202) 217-4742
ellie@nipnlg.org
yulie@nipnlg.org
gracie@nipnlg.org

*Counsel for Petitioner-Appellee*

* *Not admitted in the District of Columbia; working remotely from Wyoming and admitted in Wyoming and New York only*
‡ *Not admitted in the District of Columbia; working remotely from Texas and admitted in Texas and Georgia only*
+*Not admitted in the District of Columbia; working remotely from New York and admitted in California only*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e) because it contains 12,908 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font. This brief has been scanned for viruses pursuant to Eighth Circuit Local Rule 28A(h)(2) and is virus-free.

*/s/ Stephanie E. Norton*
Stephanie E. Norton

*Counsel for Petitioner-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on September 8, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Stephanie E. Norton*
Stephanie E. Norton

*Counsel for Petitioner-Appellee*